889 A.2d 366

**Anthony GRANDISON**

**v.**

**STATE of Maryland.**

**No. 16, Sept. Term, 2005.**

Court of Appeals of Maryland.

Dec. 16, 2005.

Reconsideration Denied Feb. 3, 2006.

414

Jennifer P. Lyman, Assigned Public Defender, on brief, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

The appellant, Anthony Grandison, was convicted of hiring Vernon Evans, Jr. to murder David Scott Piechowicz and Cheryl Piechowicz on April 28, 1983 at the Warren House Motel located in Baltimore County, Maryland; however, because Ms. Piechowicz was ill, her sister, Susan Kennedy, who was filling in for her, was murdered in her stead. Grandison was convicted of first degree murder of both victims and was sentenced to death. This Court has, in four previous opinions, rejected Grandison's various challenges to his trial, convictions, and sentences.[1]

In the present case, Grandison appeals from the denial of his motions for a new trial, to correct an illegal sentence, and to reopen his original post-conviction proceeding. Specifically, he raises three issues. Grandison argues that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), regarding the suppression of evidence that he alleges is favorable and material to the determination of his guilt and sentencing during both his 1984 guilt/innocence trial and his 1994 re-sentencing proceeding. Grandison also asserts that his sentence under

---

1. *See Grandison v. State*, 351 Md. 732, 720 A.2d 322 (1998); *Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995), *cert. denied*, 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996) (second direct appeal); *Grandison v. State*, 305 Md. 685, 506 A.2d 580 (1986), *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986) (first direct appeal); *Evans v. State*, 301 Md. 45, 481 A.2d 1135 (1984) decided jointly with *Grandison v. State*, 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985) (concerning potential double jeopardy).

Maryland's death penalty statute violated his right to due process of law under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because the jury was permitted to find that the aggravating factors outweighed the mitigating factors by a preponderance of the evidence. Finally, he contends that because he was convicted as an accessory before the fact to the murders, he was not death eligible. We reject the entirety of Grandison's current arguments.

## Facts

The basic facts of this case have been summarized by this Court in *Grandison v. State,* 305 Md. 685, 697–98, 506 A.2d 580, 585–86 (1986), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986), as follows:

> According to the State's evidence, the defendant Evans and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000.00 from Grandison for performing the murders.
>
> David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC–11 machine pistol. Nineteen bullets were fired at the victims, who died from the multiple gunshot wounds.
>
> A two count indictment was filed against Evans and Grandison in the United States District Court. They were charged with violating the Piechowiczs' civil rights by interfering with their right to be witnesses in a judicial proceed-

ing, in violation of 18 U.S.C. § 241, and with witness tampering, in violation of 18 U.S.C. § 1512.

Subsequently the present case began with a four count indictment in the Circuit Court for Baltimore County, charging Evans and Grandison each with two counts of first degree murder, one count of conspiracy to commit murder, and the use of a handgun in the commission of a felony or crime of violence. Upon the defendants' requests for removal, Grandison's trial was transferred to the Circuit Court for Somerset County and Evans's trial was transferred to the Circuit Court for Worcester County.

Additional background detail was provided in *Grandison v. State,* 341 Md. 175, 193–95, 670 A.2d 398, 406 (1995):

While Grandison was awaiting trial on the state charges, he was convicted in the federal court on both narcotics charges and witness tampering charges brought against him in connection with the murders. Thereafter, Grandison moved to dismiss the state charges on the ground that the federal convictions for witness tampering and civil rights violations and the sentences thereon constituted a double jeopardy bar to the pending state court trial. The trial court denied his motion, and on appeal of that interlocutory order we affirmed that judgment pursuant to the dual sovereignty exception to the Double Jeopardy Clause. *Evans [and Grandison] v. State,* 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (*Grandison I* ).

(Footnote omitted).

In May of 1984, Grandison was tried in the Circuit Court for Somerset County on two charges of first degree murder, one count of conspiracy to commit murder, and one count of the use of a handgun in the commission of a felony or crime of violence. During that trial, the prosecution offered significant incriminating evidence against Grandison through a number of witnesses. The most damaging testimony was elicited from Charlene Sparrow, Vernon Evans's girlfriend at the time of the murders. Sparrow testified that on April 26, 1983, she

accompanied Evans and Janet Moore, Grandison's girlfriend at the time of the murders, to the Baltimore City Jail to visit Grandison. Sparrow waited in the car while Evans and Moore met with Grandison and stated that when Evans and Moore returned nearly an hour later, the trio went to visit Theresa Purdie, the mother of Grandison's son, to obtain some money from Rodney Kelly, an associate of Grandison's. Sparrow testified that at Purdie's apartment, Evans, Moore, Kelly, and Purdie all spoke with Grandison on the phone.

Later that afternoon, according to Sparrow, she and Evans traveled with Moore to the Warren House Motel, where Sparrow attempted to reserve a room. Sparrow stated that she could not obtain a reservation for the night of April 26th because the motel was full. She did, however, reserve a room for the night of April 27th, which was corroborated by a registration slip from the Warren House bearing the same date with Sparrow's name and a room number on it. She reported to Evans that the Piechowiczs were not at the reception desk and described the security features.

Sparrow further testified that on April 27, 1983, after receiving a gun in a brown and white canvas bag and a car from Kelly, Evans and Sparrow drove over to the Warren House and Evans instructed Sparrow to wait in the car. Evans then entered the hotel with the brown and white canvas bag containing the gun. Some time later, Evans ran from the Warren House and told Sparrow to wipe off the gun, which she testified was smoking. Evans informed Sparrow that he was to receive $9,000 for the murders.

Other witnesses supplied additional testimony implicating Grandison in the murders of Scott Piechowicz and Susan Kennedy. For example, Theresa Purdie confirmed that Sparrow, Kelly, Evans, and Moore visited her apartment and that Kelly, Evans, and Moore all spoke to Grandison on the telephone. Calvin Harper, a friend of Rodney Kelly's, testified concerning the events that he witnessed when in Kelly's company on April 26th through the 28th, 1983. Harper further testified that he was present when Evans acquired the

machine pistol used in the murders from Kelly and that Kelly told him that Evans had the gun to take care of some business. Etta Horne, who worked in the hotel in housekeeping, identified Evans as the man whom she saw sitting in the lobby of the hotel immediately preceding the murders. Also, Helen Kondilidis, a waitress at the motel's basement restaurant, testified that she entered the motel shortly before the murders and also identified Evans as the man she saw there.

On May 22, 1984, the jury in Grandison's guilt/innocence trial returned guilty verdicts on all counts. Grandison was sentenced to death on June 6, 1984 on both murder counts.

In *Grandison v. State,* 341 Md. 175, 670 A.2d 398 (1995), we summarized the subsequent proceedings:

On November 1, 1990, Grandison filed a petition, pursuant to Md.Code (1957, 1987 Repl.Vol., 1990 Cum.Supp.), Art. 27, § 645A, in the Circuit Court for Somerset County seeking post conviction relief. On July 31, 1992, the circuit court granted such relief, ordering a new capital sentencing proceeding on Grandison's convictions of first degree murder. Relying upon the Supreme Court's decision in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the circuit court granted the requested relief on the grounds that the sentencing form and related jury instructions employed at Grandison's first sentencing proceeding offended the dictates of the Eighth and Fourteenth Amendments to the United States Constitution that the death penalty not be imposed where there are mitigating factors which may call for a less severe penalty. The circuit court also decided that Grandison was entitled to retroactive application of the *Mills* decision. The State applied to this Court for leave to appeal from the circuit court's grant of post conviction relief as to the death sentences, and Grandison filed a cross-application seeking review of the circuit court's denial of collateral relief on the underlying convictions. We denied both applications. *Grandison v. State,* Misc. No. 29, Sept. Term 1992 (order filed October 23, 1992). The Supreme Court denied a petition and cross-petition for writ of certiorari on March 22, 1993. *Maryland*

*v. Grandison,* 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 149 (1993); *Grandison v. Maryland,* 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 149 (1993).

In 1993, Grandison filed a number of motions in the circuit court to bar his re-sentencing on double jeopardy grounds. The circuit court denied these motions and Grandison's subsequent request for a stay of the re-sentencing proceeding pending an appeal of the circuit court's ruling on his motions. Grandison then applied to the Court of Special Appeals for a stay of the re-sentencing. On May 11, 1994, the matter was transferred to this Court. We issued an order denying the requested stay. *Grandison v. State,* Misc. No. 20, Sept. Term, 1994 (order filed May 12, 1994).

*Id.* at 194–95, 670 A.2d at 407 (footnote omitted).

Grandison's re-sentencing proceeding began on May 24, 1994 and lasted eight days. The prosecution presented the same evidence that it had introduced at Grandison's guilt/innocence trial including testimony from Cheryl Piechowicz, Charlene Sparrow, James Savage, and Calvin Harper, which was essentially identical to their testimony in the 1984 trial. The State also introduced testimony from Janet Moore for the first time during the re-sentencing proceeding. Moore's testimony corroborated the statements made by Sparrow regarding the events of the two days immediately prior to the murders. She also stated that she heard Grandison tell Kelly to take Evans to the Warren House and show him "who the white couple was." At the conclusion of Grandison's capital re-sentencing proceeding, on June 3, 1994, a Somerset County jury imposed two death sentences. This Court affirmed the death sentences in *Grandison v. State,* 341 Md. 175, 670 A.2d 398 (1995).

On November 15, 1999, Grandison initiated the present litigation when he filed a motion for a new trial, pursuant to Maryland Rule 3–441. On January 18, 2000, he filed a Motion to Correct Illegal Sentence, and approximately three months later, filed a *pro se* Motion to Reopen Original Guilt/Innocence Post Conviction.

The Circuit Court held two days of evidentiary hearings on May 20–21, 2004. During the hearings, Grandison introduced a number of pieces of allegedly exculpatory or impeaching evidence that he asserted had been suppressed by the prosecution and that, according to Grandison, significantly undermined the confidence in the verdicts rendered against him at both his 1983 trial and 1994 re-sentencing proceeding such that the evidence was "material" for the purpose of establishing a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[2]

Grandison principally relied upon testimony and statements from Roberta Weinstein, the proprietor of the Casa del Oro jewelry shop located in the lobby of the Warren House and witness to the shootings, Derese Pinkney, a woman who lived near the Warren House and claimed to have seen the shooter run past her house, and Janet Bannister, an employee at the Warren House who was present at the motel on the day of the murders, to impeach the testimony of Helen Kondilidis and Etta Horne, the two Warren House employees who identified Vernon Evans as the gunman.

Weinstein testified that, from her vantage point in the Casa del Oro jewelry store, she saw the back and side of the gunman through the window and that he was approximately thirty feet away. She stated that she could not see the gunman's face, but testified that he was African–American, despite her sworn testimony during federal proceedings that she could not discern his race. She also estimated his height as 5'7" or 5'8", whereas Evans is 5'2". Weinstein testified that she could not identify Evans during a line-up conducted shortly after the shooting and stated that upon viewing Evans

2. The Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), essentially provides that in order to establish a *Brady* violation the defendant must prove that (1) the evidence was suppressed by the prosecution either intentionally or unintentionally, (2) the evidence was favorable to his defense either because it is exculpatory, provides the basis for mitigation of sentence, or impeaches the testimony of a witness, and (3) it is material.

in the courtroom, she observed that the shooter was "a lot taller."

Derese Pinkney testified that shortly after the shooting, a man ran past her house from the direction of Warren House as she was standing on her front porch waiting for her children to arrive home from school. She stated that he was African–American and estimated the person's height to be between 5'8" and 5'9". She also asserted that Evans was not that man because he was much shorter. Pinkney, however, admitted that she did not get a good look at the man and stated that she would not be able to testify that that individual was any particular person and that she was not paying much attention to him.

Grandison emphasized Janet Bannister's statements and testimony as evidence impeaching Kondilidis's and Horne's identifications of Evans. Bannister testified at the motions hearing that shortly before the murders, as she was leaving Warren House with Mildred Tally shortly after her shift ended at 3:00 p.m., she saw an African–American male in the lobby, who at one time stood next to her, and whom she would estimate as being between 5'5" and 5'8" in height. Further in her testimony, however, she stated that she was not paying much attention to him because she was clipping a coupon and only remembered that he was taller than her 5'1" frame. Moreover, she could not state with certainty whether Helen Kondilidis was present in the lobby after she left it and did not even know Etta Horne's name, or whether Horne was present in the lobby.

Grandison introduced the surveillance videotape from the Casa del Oro jewelry store as corroborating evidence for the statements and testimony of Bannister and Weinstein and as evidence impeaching Kondilidis's and Horne's identifications of Evans as the gunman. He asserted that the videotape showed that Weinstein could demonstrate the gunman's position with respect to the reception desk and supported her claims that Evans was not the triggerman. Also, according to Grandison, it verified the timing attested to by Bannister, which under-

mined Helen Kondilidis's testimony that she was in the lobby immediately prior to the shooting, as well as her identification of Evans as the shooter.

Grandison further relied on the 302 statements [3] from Hessie Hightower and Alan Summerfield to impeach Kondilidis. Both Hightower and Summerfield stated that they were present in the Warren House lobby at approximately 2:45 p.m. on April 28, 1983, about thirty-five minutes before the shooting. Hightower said that she only saw Scott Piechowicz in the lobby, whereas Summerfield "did not notice anyone there."

Grandison also presented the 302 report of the interview with Mary Lefkowitz who stated that she "left the Warren House at approximately 2:50 p.m. [and there] was no one in the lobby of the Warren House," which was relied upon by Grandison to impeach Kondilidis regarding Kondilidis's presence in the lobby.

The 302 statement of Mary Williams, also alleged by Grandison to be *Brady* evidence, simply stated that she spoke with Bannister in the rear parking lot around 3:15 p.m. and did not state anything in relation to any individuals in the lobby.

The 302 statement of Ruth Blatt, also relied upon by Grandison to undermine Kondilidis's and Horne's testimony concerning their presence in the lobby, indicated that Blatt arrived at the Needlepoint Shop in Warren House, which is adjacent to the lobby and front desk, at approximately 2:15 p.m. on April 28, 1983, and that after purchasing some items from the shop, departed between 3:00 p.m. and 3:15 p.m. shortly before the shooting. Blatt stated "that she did not recall seeing anyone in the lobby, nor did she observe anything that seemed unusual." The 302 statements of Florence Tayman and Harriet Glazer, shop employees, corroborated Blatt's statement.

---

3. The statements are referred to as "302 statements" because "[t]he interview report was on an FBI form displaying the number 302." *Evans v. State*, 382 Md. 248, 258, 855 A.2d 291, 297 (2004).

The 302 reports of the interviews conducted with Evelyn Pushkin and Marie Valle, both of whom worked at the Village Beauty Salon located in the basement of the Warren House, stated that the two women left the salon together and separated in the lobby "at approximately 3:15 p.m." on April 28, 1983, approximately five minutes before the shooting, with Pushkin departing through the front entrance and Valle leaving through the rear. Pushkin stated that she saw Susan Kennedy and Scott Piechowicz at the front desk, but that there was no one else present in the lobby. Valle's 302 statement reflected that she did not observe anyone in the lobby. Grandison argued that the 302 statements weakened the persuasive power of Kondilidis's and Horne's testimony asserting that they observed Evans in the Warren House lobby immediately prior to the killings.

Grandison also relied upon the 302 statement of Irene Farace that she arrived at Warren House around 2:45 p.m. on April 28, 1983 and did not observe anyone in the lobby, as evidence impeaching Kondilidis and Horne. Farace's statement was confirmed by the 302 report of the interview conducted with Mildred Goldberg, the proprietor of the dress shop in the Warren House lobby.

The 302 statement by Mary Gertrude Angel indicated that she arrived at Warren House at about 2:50 p.m. and entered through the rear entrance. She stated that she did not see Scott Piechowicz or Susan Kennedy behind the desk.

Grandison also asserted that Darryl Primeaux's grand jury testimony directly impeached Calvin Harper's account of his activities with Rodney Kelly from April 26th to April 28th, 1983, which was key in the prosecution's contention that Grandison directed Rodney Kelly to assist Evans in the murders. Primeaux, throughout his grand jury testimony, disclaimed any participation in any of the activities alleged by Harper. He also stated, in response to a question about whether Kelly informed him that Kelly had a machine gun, that he was not that close with Kelly and that Kelly would not have told him that information. Grandison also presented the

handwritten statement from Harper to impeach his testimony that he saw Kelly on the same day he was released from the Training Center.

At the conclusion of the hearings, the Circuit Court requested written memoranda consolidating and summarizing the arguments presented in connection with Grandison's three motions, which Grandison and the State provided. On February 25, 2005, Judge Daniel M. Long denied all of Grandison's motions in a written opinion, in which he noted that the surveillance tape, the unredacted 302 statements, and the Primeaux grand jury transcript, although arguably relevant, would "require an abstract, if not imaginative, line of reasoning to deduce any beneficial value at trial." This was the case, the court noted, because of the overwhelming evidence that Evans was the gunman. The court observed that the inconsistencies in the witnesses' testimony were the result of the common phenomena of significant variations among eyewitness statements.

Moreover, Judge Long stated that Grandison also failed to establish that the prosecution suppressed any of the evidence at issue. Judge Long held that there was no evidence that the prosecution had any information in its possession that Grandison lacked knowledge of and would have benefitted from knowing and concluded that the evidence presented was not material to Grandison's guilt or sentence. In his opinion, Judge Long stated that even if the identifications of Evans made by Kondilidis and Horne were discredited entirely, the result would be inconsequential because there remained significant and persuasive evidence that Grandison directed the murders. Therefore, Judge Long concluded that Grandison did not satisfy the three components of a *Brady* violation.

The Circuit Court also was not persuaded that the Maryland death penalty statute is unconstitutional based on this Court's prior holdings addressing the application of *Apprendi v. New Jersey* and *Ring v. Arizona*. Furthermore, the court held that Grandison was death eligible as an accessory before the fact under the language of the applicable aggravating

circumstance listed in the statute governing the imposition of the death penalty at sentencing.

On March 29, 2005, this appeal followed, presenting us with the following issues:

1. Did the State violate Mr. Grandison's Due Process rights under *Brady v. Maryland* and its progeny, by suppressing evidence favorable to him and material to his guilt or sentencing before and during his 1984 guilt/innocence trial?

2. Did the State violate Mr. Grandison's Due Process rights under *Brady v. Maryland* and its progeny, by suppressing material evidence, favorable to him, before and during his 1994 re-sentencing trial?

3. Did Mr. Grandison's sentence under Maryland's death penalty statute violate due process of law under *Apprendi v. New Jersey* and *Ring v. Arizona*, where the jury was allowed to find that aggravating factors outweighed mitigating factors only by a preponderance of the evidence?

4. Did Mr. Grandison's conviction as an accessory before the fact to murder, and a court finding that he was not a first degree principal together with no finding that he was a second degree principal, preclude imposition of the death penalty?

Because we determine that the evidence presented by Grandison as *Brady* evidence fails to satisfy *Brady's* materiality requirement that the evidence present a reasonable probability that, had it been disclosed, the result of the proceeding would have been different, we hold that the State did not violate Grandison's due process rights with respect to both his 1983 guilt/innocence trial and his 1994 re-sentencing under the terms of *Brady*. Moreover, we reaffirm our prior conclusion that Maryland's death penalty statute does not violate the Supreme Court's rulings in *Apprendi v. New Jersey* and *Ring v. Arizona*. Furthermore, based on a plain meaning interpretation of the death penalty statute, we hold that Grandison is eligible for the death penalty as an accessory before the fact to murder where contractual murder constitutes the aggravating

circumstance forming the basis for the imposition of the death penalty.

## Discussion

Grandison argues that the facts of the present case satisfy the elements required in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), namely, that the State withheld the evidence from him either intentionally or unintentionally, that the suppressed evidence was favorable to Grandison, meaning that it was exculpatory, presented grounds for mitigation of sentence, or impeached witness testimony, and that the evidence was material when viewed in light of his 1983 trial and 1994 re-sentencing such that it created a reasonable probability that, had the evidence been disclosed, the result would have been different. According to Grandison, the State suppressed the evidence at issue because it was in the State's possession, it was not disclosed during any of Grandison's prior proceedings, and he could not have discovered it through his own investigation based on previously revealed evidence. Moreover, because the evidence, under Grandison's interpretation, serves to impeach Kondilidis, Horne, and Harper, who testified for the State at the 1983 trial and the 1994 re-sentencing, the evidence is favorable to Grandison under *Brady*.

With respect to the materiality prong of *Brady*, Grandison argues that the Circuit Court failed to adequately address the evidence in its conclusion that the suppressed evidence was not sufficient to present a "reasonable probability" of altering the verdict. Grandison asserts that the Circuit Court conducted a "piecemeal" analysis rather than examining the evidence for its cumulative effect, which he contends is the applicable standard under *Kyles v. Whitley*, 514 U.S. 419, 439–40, 115 S.Ct. 1555, 1568–69, 131 L.Ed.2d 490, 509–10 (1995).

Grandison also argues that the Maryland death penalty scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because the statute permits the weighing of aggravating and

mitigating factors to be determined under the preponderance of the evidence standard as opposed to the reasonable doubt standard. Although he recognizes that this Court has repeatedly rejected his argument on numerous occasions, Grandison urges this Court to revisit the issue and rule in his favor.

Grandison's final argument is premised on the assertion that he is not eligible for the death penalty because he was found guilty as an accessory before the fact rather than a principal. He bases this argument on the fact that the a person who murders a police officer is only eligible for the death penalty if he is at least a first or second degree principal and argues that it follows that an accessory before the fact to a contract murder would not qualify. He also relies upon language from *Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995), in which this Court stated that the death penalty statute's imposition of the death penalty on individuals convicted as second degree principals does not violate the Eighth Amendment, and *Gary v. State*, 341 Md. 513, 671 A.2d 495 (1996), in which this Court stated that the death penalty could not be imposed on a person convicted of conspiracy to murder.

The State argues that this Court should be guided by its opinion in *Evans v. State*, 382 Md. 248, 855 A.2d 291 (2004), in denying Grandison's claims. According to the State, because Evans presented nearly identical evidence and it was subject to a determination with respect to materiality, this Court should consider the *Evans* rationale persuasive.

The State also contends that the prosecution did not violate *Brady*, because it did not suppress material evidence that was favorable to Grandison. Specifically, the State asserts that Grandison, through counsel, was provided with the 302 statements that Grandison relied upon in the motions hearing during his federal prosecution. Moreover, the State argues that the prosecution's discovery process consists of an "open file" policy in which the prosecutor made copies of documents in his possession, with the exception of work product, and provided them to defense counsel. The only documents not copied, according to the State, were photographs, work prod-

uct, and copies of hearing or trial transcripts. Moreover, the State argues that Grandison and his counsel were provided a copy of the surveillance video at issue in the case *sub judice.*

The State further contends that the evidence also was not favorable nor material to Grandison. Although some of the evidence might be considered "marginally relevant," in the State's view, it is not "favorable" under the *Brady* standard. The State asserts that Grandison's proffered evidence fails to meet the materiality standard because, although it may impeach the testimony of Helen Kondilidis and Etta Horne, it did not place the entire case in a different light so as to undermine confidence in the verdict.

The State also urges this Court to conclude that the weighing process in Maryland's death penalty statute is constitutional, consistent with prior decisions rendered by this Court and asks that this Court affirm its previous holdings. The State asserts that Grandison's reliance on *Ring v. Arizona* is misplaced as the Supreme Court has stated that its decision in *Ring* was not intended to have retroactive application.

Finally, the State contends that the death penalty was properly imposed in Grandison's case. The State asserts that the aggravating factor, contractual murder, which was alleged in this case, is an exception to the requirement in Maryland's death penalty statute that only a first degree principal to first degree murder is death eligible. Therefore, according to the State, Grandison was subject to the death penalty and his death sentences were proper.

## The *Brady* Analysis

Grandison's primary contention is that he was prejudiced by the cumulative effect of the State's alleged repeated violations of its constitutional obligations under *Brady.* Therefore, we shall begin our analysis of the elements that Grandison is required to establish to prevail on his *Brady* claim. As we recently stated in *Conyers v. State,* 367 Md. 571, 597–98, 790 A.2d 15, 30–31 (2002):

The Supreme Court made clear in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." [*Brady,* 373 U.S.] at 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215. In order to establish a *Brady* violation, Petitioner must establish "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." Evidence that is obviously favorable must be disclosed even absent a specific request by the defendant.

Impeachment evidence, as well as exculpatory evidence, is "evidence favorable to an accused." [*C]f Napue v. People of Ill.,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (holding that the prohibition against the use of false testimony applies even when the evidence goes only to the credibility of the witness because the jury's assessment of credibility can be determinative of guilt or innocence).

\*   \*   \*

The standard for measuring materiality of the undisclosed evidence is strictest if it "demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." In [*United States v.*] *Agurs,* [427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)] the Supreme Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." In cases where there is no false testimony but the prosecution nonetheless fails to disclose favorable evidence, the standard for materiality, in the language of the Supreme Court, is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." [*S*]*ee* ... *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[4] Materiality is assessed by considering all of the suppressed evidence collectively. The question, therefore, "is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same," which is determined in reference to the sum of the evidence and its significance for the prosecution.

(Footnote omitted and alterations in original).

We observe that *Brady* jurisprudence predominantly addresses the materiality prong. See, *e.g., Kyles v. Whitley,* 514 U.S. 419, 434–454, 115 S.Ct. 1555, 1565–75, 131 L.Ed.2d 490, 505–18 (1995); *United States v. Bagley,* 473 U.S. 667, 678–84, 105 S.Ct. 3375, 3381–85, 87 L.Ed.2d 481, 491–95 (1985); *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Brady,* 373 U.S. at 87–91, 83 S.Ct. at 1196–98, 10 L.Ed.2d at 218–21. Various courts have recognized that the materiality prong is the gravamen of analysis under *Brady. See, e.g., United States v. Kubiak,* 704 F.2d 1545, 1550 (11th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983) (in determining whether nondisclosure of exculpatory information constituted a denial of due process, "the focus is not upon the fact of nondisclosure, but upon the impact of the nondisclosure on the jury's verdict"); *Floyd v. State,* 902 So.2d 775, 778 (Fla.2005) (stating that "the focus in postconviction *Brady–Bagley* analysis is ultimately the nature and weight of undisclosed information"); *State v. Louviere,* 833 So.2d 885, 897 (La.2002) ("[W]e observe that in the main,

---

4. "This Court has interpreted the reasonable probability standard from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) to mean a 'substantial possibility that ... the result of [the] trial would have been any different.' " *Conyers,* 367 Md. at 598–99, 790 A.2d at 31, citing *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992); *Bowers v. State,* 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990).

the *Brady* jurisprudence focuses on the materiality inquiry"); *Atkinson v. State,* 778 A.2d 1058, 1063 (Del.2001) ("In this case, as in most cases where the issue of a '*Brady* violation' is raised, the focus is on the third component—materiality"); *State v. Marshall,* 148 N.J. 89, 690 A.2d 1, 33 (1997) ("The focus of the *Brady* analysis often is whether evidence is sufficiently 'material' to the defendant's case to come within the State's *Brady* obligation"). Therefore, because our determination of Grandison's *Brady* claim will ultimately turn on whether the evidence is material, we shall assume only for the sake of argument that the evidence in issue was withheld and that it was favorable to Grandison with respect to his guilt or sentencing and focus our attention on the issue of whether the suppressed evidence was material.[5]

█ We base our conclusion on the factors that this Court previously has found to be useful in determining materiality for *Brady* purposes. *Conyers,* 367 Md. at 612, 790 A.2d at 40. These factors applicable to the facts of this case include the specificity of the defendant's request for disclosure materials, "the closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt," "the centrality of the particular witness to the State's case," and "whether and to what extent the witness's credibility is already in question." *Wilson v. State,* 363 Md. 333, 352, 768 A.2d 675, 685 (2001).

█ Grandison's proffered evidence can be divided into three categories. The first category consists of descriptions of the African–American male observed in the Warren House lobby or the vicinity of the motel shortly before the murders, which allegedly contradict Etta Horne's and Helen Kondili-dis's identifications of Evans, including the testimony from

---

5. We limit our examination because, based on our conclusion that the evidence at issue is not material, Grandison is unable to satisfy the three prongs under *Brady,* and as such, could not prevail even if we were to find that the evidence was withheld and was favorable to Grandison's defense.

Janet Bannister, Roberta Weinstein, and Derese Pinkney, and the 302 statements by Janet Bannister.

The second category, which is comprised of the majority of the evidence, was offered to show that between 2:45 p.m. and 3:15 p.m. on April 28, 1983, the witnesses did not see, and the surveillance tape did not record, Etta Horne or Helen Kondilidis in the lobby at the time they had testified to being present there, and that the witnesses did not observe anyone in the lobby except Scott Piechowicz and Susan Kennedy.

The third category consists of Darryl Primeaux's grand jury testimony and Calvin Harper's handwritten signed statement to the police on May 12, 1983, which Grandison asserts impeaches Calvin Harper's testimony concerning the interaction between Rodney Kelly, whom Harper claims provided Evans with the murder weapon, and Evans on April 18, 1983.

Grandison argues that this testimonial and statement evidence, when viewed in conjunction with the surveillance videotape that corroborates the statements and testimony of the witnesses impeaching Kondilidis and Horne, creates sufficient doubt so as to undermine our confidence in the verdict against him. Our view of the evidence, however, differs and we determine that the evidence, when examined as a whole, does not undermine our confidence in the verdicts against Grandison.

The testimony and statements upon which Grandison relies concerning the appearance of the man in the lobby as well as the statements indicating that Kondilidis and Horne were not in the lobby between 2:45 p.m. and 3:15 p.m. are examples of the well-documented "phenomena that different witnesses' descriptions of a person or estimates of time will often vary to a considerable extent." *Evans v. State*, 382 Md. 248, 265, 855 A.2d 291, 301 (2004); *see, e.g., United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967) ("The vagaries of eyewitness identification are well-known"), and the authorities cited therein. When examined with that precept in mind, it is clear that the testimony and statements do not create a significant possibility that the outcome of the

trial would have been any different, and Grandison would have been convicted of hiring Evans to kill two federal witnesses.

Even assuming *arguendo*, as the Circuit Court did, that the evidence impeached Horne's and Kondilidis's accounts of the events leading up to the murders, which is the purpose of the majority of Grandison's proffered evidence, it does not serve to meaningfully deplete the cumulative weight of the remaining independent evidence against Evans and, by extension, Grandison during Grandison's 1983 guilt/innocence trial and his 1994 re-sentencing. During the 1983 trial, the State's key witness was Charlene Sparrow, Evans's girlfriend and accomplice. Sparrow's testimony that she accompanied Evans and Janet Moore to the Baltimore City Jail, and to Theresa Purdie's apartment to meet with Kelly, as well as her statements that Evans told her that he was going to kill someone remain unimpeached by Grandison's proffered evidence. Moreover, Sparrow testified that Evans was at the Warren House at the time of the shootings, independent of Horne's and Kondilidis's identifications. She further recounted that Evans told her that he shot Scott Piechowicz and Susan Kennedy. Sparrow's testimony also was corroborated by a number of independent witnesses.

Those portions of Sparrow's testimony implicating Rodney Kelly in the planning of the murders are supported by Calvin Harper's testimony as well. Harper described the bag in which Kelly carried the gun used in the murders as a "brown sports bag," a description that is consistent with Sparrow's statement that the bag was a brown and white canvas bag. Moreover, Primeaux's grand jury testimony does little to discredit Harper. Although Primeaux denied participation in the events that Harper alleged to have occurred, he stated that his knowledge is not complete because Kelly would not have shared information concerning the gun and murder plot with him.

The prosecution's case in the 1983 trial was further supported by the testimony of Special Agent Daniel Ryan and handwriting expert Luther Senter. Special Agent Ryan testi-

fied concerning the authenticity of a letter addressed to Janet Moore, dated March 14, 1983, and written by Grandison,

> The judge sure make his decision by at least Wednesday, I'm banking on him throwing it out, but in the mean time I am preparing for trial. Like I said no one can put me in there, the white bitch testimony ain't shit, because she's talking about Nov. 9, 82, at 11 p.m. at night, the hotel was rented on Nov. 10, 82 and the black dude stated that I was not the one who rented the hotel.

> *    *    *

> I might have you take a friend of mine, name short [Evans's nickname], over there to see one of the kids, probably Rodney [Kelly] or Mike [Queen], because I want him to take care of something to be on the safe side.

Senter confirmed that the letter was in Grandison's handwriting.

The evidence presented by the prosecution at Grandison's 1983 trial, including that of Evans's guilt and Grandison's role as mastermind is overwhelming and supports our confidence in the result of Grandison's 1983 trial. Therefore, we are not convinced that there is a reasonable probability that the jury in the 1983 trial would have reached a different result in light of evidence Grandison now provides.

We reach an identical conclusion with respect to the case presented during Grandison's 1994 re-sentencing proceedings. The prosecution's case was even more powerful due to the addition of Janet Moore's testimony. Moore testified to the fact that Grandison called her on April 26, 1983 and told her to pick up Evans and bring him to the Baltimore City Jail to visit him. She further corroborated Sparrow's account, from both 1983 and 1994, that Moore and Evans went into the jail while Sparrow waited in the car, and later that the three went to Theresa Purdie's apartment to see Rodney Kelly. She also stated, consistent with Sparrow's 1983 and 1994 testimony, that at Purdie's apartment, Evans, Kelly, Purdie, and Moore spoke to Grandison on the phone. Moore testified that Grandison asked her to take Evans to Warren House, once more

corroborating Sparrow's testimony that she and Evans went to Warren House in the company of Moore. Moreover, Moore stated that while on a three-way call, she heard Grandison tell Kelly to take Evans in the car up to the motel and show Evans who the "white couple" was.

The remainder of the prosecution's 1994 re-sentencing case was nearly identical to that presented in Grandison's 1983 trial. Thus, we conclude that the prosecution's evidence against Grandison at his 1994 re-sentencing proceeding was even more persuasive than that introduced at his 1983 guilt/innocence trial.

Therefore, we hold that the evidence at issue in the case at bar fails to satisfy the materiality component of the *Brady* analysis because it does not create a reasonable probability that, had the evidence been disclosed to the defense (assuming it had not), Grandison would not have been convicted and sentenced to death. Because Grandison has failed to satisfy the materiality prong of the *Brady* analysis, we hold that his *Brady* claim is without merit.

### *Ring/Apprendi* Claim

■ Grandison argues that Maryland's death penalty statute, which permits a jury to find that aggravating factors outweigh mitigating factors by a preponderance of the evidence, is facially unconstitutional under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because *Apprendi* and *Ring* require such a determination to be found beyond a reasonable doubt.[6]

Maryland Code (1957, 1982 Repl.Vol.), Article 27, Section 413(h) provides:

(h) *weighing mitigating and aggravating circumstances.—*
(1) If the court or jury finds that one or more of these

---

**6.** Despite the Supreme Court's holding in *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), that *Ring* is not to be applied retroactively, we need not address that issue, because even if *Ring* were applicable, Grandison would not be entitled to relief.

mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

(2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

(3) if it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

The issue of whether Maryland Code (1957, 1982 Repl.Vol.), Article 27, Section 413(h) violates due process by permitting the jury to find, by a preponderance of the evidence, that the aggravating factors found by the jury outweigh the mitigating circumstances it finds to exist has been addressed and resolved by this Court on numerous occasions, beginning with *Tichnell v. State,* 287 Md. 695, 729–34, 415 A.2d 830, 848–50 (1980), and ending most recently in *Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003), *cert. denied,* 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004). We have consistently determined that the weighing process based on a preponderance of the evidence does not violate due process.

The actual holding of *Apprendi* is that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455. In *Ring,* the Supreme Court stated that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring,* 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77 (internal citations omitted). As we stated in *Oken,* it is clear from the Supreme Court's opinion that *Ring* only applies to the "eligibility phase of the sentencing process." *Oken,* 378 Md. at 251, 835 A.2d at 1147. Thus, those aggravating factors, which serve to narrow the class of death-eligible defendants in compliance with the Eighth Amendment, must be found "by a

proper sentencing authority beyond a reasonable doubt in order to comply with the requirements of the Sixth Amendment." *Id.*

Contrary to Grandison's position, *Ring* does not govern the penalty selection phase of the death sentencing process. *Id.* This conclusion is consistent with the concurring opinion by Justice Scalia, in which Justice Thomas joined, observing that

today's judgment has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring,* 536 U.S. at 612–13, 122 S.Ct. at 2445, 153 L.Ed.2d at 579 (Scalia, J., concurring) (emphasis in original).

The holding in *Ring* clearly states that it is the finding of an aggravating circumstance, and only the finding of an aggravating circumstance, that results in death-eligibility. Because the Maryland death penalty statute requires that an aggravating circumstance be found by a proper sentencing authority beyond a reasonable doubt, the Maryland statute does not violate the Sixth Amendment requirements most recently stated in *Apprendi* and *Ring.*

Moreover, as we stated in *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001):

Notwithstanding the language in [Article 27,] § 414(e)(3) directing this Court, on appellate review, to determine whether "the evidence supports the jury's ... finding that the aggravating circumstances outweigh the mitigating circumstances," the weighing process is not a fact-finding one based on evidence. Mitigating circumstances do not negate aggravating circumstances, as alibi negates criminal agency or hot blood negates malice. The statutory circumstances specified or allowed under § 413(d) and (g) are entirely independent from one another—the existence of one in no

way confirms or detracts from another. The weighing process is purely a judgmental one, of balancing the mitigator(s) against the aggravator(s) to determine whether death is the appropriate punishment in the particular case. This is a process that not only traditionally, but quintessentially, is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt. *See Gerlaugh v. Lewis*, 898 F.Supp. 1388, 1421–22 (D.Ariz.1995), *aff'd*, 129 F.3d 1027 (9th Cir.1997), *cert. denied*, 525 U.S. 903, 119 S.Ct. 237, 142 L.Ed.2d 195 (1998) (Constitution does not require weighing beyond a reasonable doubt); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *Miller v. State*, 623 N.E.2d 403, 409 (Ind.1993) (weighing is a balancing process, not a fact to be proven; reasonable doubt standard does not apply).

*Id.* at 126–27, 786 A.2d at 652. We affirm the reasoning explicated in *Borchardt* that the weighing process is not a fact-finding one deducible from the evidence, but rather is a matter of judgment. *Ring* applies only to the finding of aggravating factors during the eligibility phase of sentencing and does not impact the selection phase of the process. *Oken*, 378 Md. at 259, 835 A.2d at 1152. As we noted in *Oken*, the Supreme Court has consistently held that as long as "there are no undue restraints upon the sentencing authority's ability to consider mitigating circumstances, there are no constitutional requirements regarding the actual act of selection, or regarding the relative weight attached to the factors." *Id.* at 259–60, 835 A.2d at 1152. Therefore, we conclude that the jury's weighing of aggravating and mitigating circumstances under the preponderance of the evidence standard is constitutional.

Despite our repeated determinations that *Apprendi* and *Ring* do not require that a jury must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt, Grandison urges us to revisit the issue in light of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220, 125

S.Ct. 738, 160 L.Ed.2d 621 (2005), and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), wherein the Court applied *Apprendi* principles to reverse the sentences imposed upon Booker and Blakely.

In *Blakely,* the Supreme Court addressed Washington State's determinate sentencing scheme. In that case, Blakely pleaded guilty to kidnaping, a class B felony punishable by a term of not more than 10 years. *Blakely,* 542 U.S. at 296, 124 S.Ct. at 2534–35, 159 L.Ed.2d at 410–12. Other provisions of Washington law required the judge to impose a "standard" sentence of 49 to 53 months, unless the judge found "substantial and compelling reasons justifying the exceptional sentence." *Id.* at 298–99, 124 S.Ct. at 2535, 159 L.Ed.2d at 411. Although the prosecutor recommended that the judge sentence Blakely within the "standard" range, the judge found that Blakely had acted with "deliberate cruelty" and sentenced him to 90 months. *Id.* at 298–99, 124 S.Ct. at 2535, 159 L.Ed.2d at 411. The Supreme Court held that the statutory scheme violated the principles explicated in *Apprendi* because "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 302, 124 S.Ct. at 2537, 159 L.Ed.2d at 413–14. According to the Court, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' . . . and the judge exceeds his proper authority." *Id.* at 302, 124 S.Ct. at 2537, 159 L.Ed.2d at 414 (internal citation omitted).

In *Booker,* the sentence authorized for Booker's drug offense was "not less than 210 nor more than 262 months in prison" under the Federal Sentencing Guidelines. —— U.S. at ——, 125 S.Ct. at 746, 160 L.Ed.2d at 639. The judge, in a post-sentencing proceeding, concluded by a preponderance of the evidence that Booker had possessed an additional 566 grams of crack cocaine and that he was guilty of obstructing justice, which placed Booker in a sentencing range of 360

months and life imprisonment; the judge imposed a 30–year sentence. *Id.*

In his statement of the Court's holding, Justice Stevens stated that *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), *Apprendi,* and *Ring* made clear that the defendant has the right to have "a jury find the existence of 'any particular fact' that the law makes essential to his punishment." *Booker,* —— U.S. at ——, 125 S.Ct. at 749, 160 L.Ed.2d at 642, quoting *Blakely,* 542 U.S. at 301, 124 S.Ct. at 2536, 159 L.Ed.2d. at 412. Relying on the Court's holding in *Blakely,* the Court explained that its "precedents . . . make clear 'that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*' " *Id.* (emphasis in original). Accordingly, the Court reaffirmed its holding in *Apprendi:* "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at ——, 125 S.Ct. at 756, 160 L.Ed.2d at 650.

We are not persuaded that either *Blakely* or *Booker* requires us to reconsider the viability of the weighing aspect of Maryland's death penalty scheme. Unlike the issues before the Supreme Court in *Blakely* and *Booker,* the weighing process is not a fact-finding endeavor based on evidence, but is a determination requiring the sentencing authority, in this case the jury, to exercise its judgment in balancing the aggravating factors against the mitigating ones. *Borchardt,* 367 Md. at 126–27, 786 A.2d at 652. Therefore, we affirm our prior holdings that Maryland's death penalty statute, which permits the jury to find that aggravating factors outweigh mitigating factors by a preponderance of the evidence, is constitutional under *Apprendi v. New Jersey* and *Ring v. Arizona* as previously stated in *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001).

### Grandison's Eligibility for the Death Penalty

■ Grandison argues that he is not death-eligible because he was found guilty of first degree murder as an accessory before the fact. We disagree.

In *Oken v. State*, 378 Md. 179, 835 A.2d 1105 (2003), Judge Harrell, writing for this Court, summarized the history of Maryland's death penalty statute:

In response to the Supreme Court's evolving jurisprudence in this area, Maryland's death penalty statutory scheme has undergone multiple changes in the last thirty-[three] years. Maryland Code (1957, 1971 Repl.Vol.), Article 27, § 413, provided in relevant part that "[e]very person convicted of murder in the first degree ... shall suffer death, or undergo a confinement in the penitentiary of the State for the period of their natural life." This version of Art. 27, § 413 was found to be unconstitutional as regards the death penalty in *Bartholomey v. State*, 267 Md. 175, 297 A.2d 696 (1972), in response to the Supreme Court's decision in *Furman* [*v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)]. It was replaced by Maryland Code (1957, 1976 Repl. Vol.), Article 27, § 413, applicable to offenses committed on or after 1 July 1975, which in turn was found to be unconstitutional in *Blackwell v. State*, 278 Md. 466, 365 A.2d 545 (1976). The statute declared unconstitutional in *Blackwell* was replaced by renumbered Maryland Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.), Article 27, § 412, applicable to offenses committed on or after 1 July 1978. This version has remained substantively unchanged and is the first version of the current Maryland death penalty scheme, along with Maryland Code (1957, 1976 Repl.Vol., 1978 Cum. Supp.), [Article 27], § 413 and 414, containing the additional sentencing and review elements at issue in the present case. Additional minor amendments were made in 1995 and 1996. Article 27, §§ 412, 413, and 414 were repealed by Ch. 26, Acts 2002, effective October 1, 2002 and re-enacted without substantive change as Maryland Code (1974, 2002 Repl.Vol.,

2003 Supp.), Criminal Law Article, §§ 2–101, 2–201, 2–202, 2–203, 2–301, 2–302, 2–303, and 1–401.

*Oken,* 378 Md. at 194–95, 835 A.2d at 1114 (alterations added).

Because Grandison was convicted prior to the 2002 re-enactment of the Code, we shall address his argument refer-ring to the Code sections as they existed prior to the 2002 re-enactment. Section 412 of Article 27 of the Maryland Code stated the punishment for murder, in pertinent part, as fol-lows:

(a) *Designation of degree by court or jury.*—If a person is found guilty of murder, the court or jury that determined the person's guilt shall state in the verdict whether the person is guilty of murder in the first degree or murder in the second degree.

(b) *Penalty for first degree murder.*—A person found guilty of murder in the first degree shall be sentenced either to death or to imprisonment for life. The sentence shall be imprisonment for life unless (1) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon which it intended to rely, and (2) a sentence of death is imposed in accordance with § 413.

In Grandison's sentencing and re-sentencing proceedings after he had been convicted of first degree murder as an accessory before the fact, the jury found that the prosecution proved the aggravating factor of contractual murder beyond a reasonable doubt. Section 413 of Article 27 of the Maryland Code defines the contractual murder aggravating circum-stance as follows:

(d) *Consideration of aggravating circumstances.*—In deter-mining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

\* \* \*

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursu-

ant to an agreement or contract for remuneration or the promise of remuneration.

*    *    *

(e) *Definitions.*—As used in this section, the following terms have the meanings indicated unless a contrary meaning is clearly intended from the context in which the terms appear:

(1) The terms "defendant" and "person," except as those terms appear in subsection (d)(7), include only a principal in the first degree.

[11] When attempting to ascertain the meaning of a statute, "we first look to the normal, plain meaning of the language.... If that language is clear and unambiguous, we need not look beyond the provision's terms...." *Bienkowski v. Brooks,* 386 Md. 516, 536, 873 A.2d 1122, 1134 (2005); *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 81 (2004). "Moreover, when the meaning of a word or phrase in a constitutional or statutory provision is perfectly clear, this Court has consistently refused to give that word or phrase a different meaning on such theories that a different meaning would make the provision more workable, or more consistent with a litigant's view of good public policy, or more in tune with modern times, or that the framers of the provision did not actually mean what they wrote." *Bienkowski,* 386 Md. at 537, 873 A.2d at 1134.

Grandison, under the definition of first degree principal provided in *Johnson v, State,* 303 Md. 487, 510, 495 A.2d 1, 12 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), could not have been convicted as a first degree principal because he did not actually commit "a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent." *Id.,* quoting *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041, 1046 (1978). Nor could he have been convicted as a second degree principal because he did not "aid[ ], counsel[ ], command[ ] or encourage[ ] the commission of the crime in his presence." *Id.* Therefore, Grandison must be considered an accessory before the fact because he "is guilty

of felony by reason of having aided, counseled, commanded or encouraged the commission thereof, without having been present either actually or constructively at the moment of perpetration" through his employment of Evans to kill the witnesses against him. *Ward,* 284 Md. at 197, 396 A.2d at 1046–47.

As we stated in *Evans v. State,* 382 Md. 248, 855 A.2d 291 (2004), the language of Section 413(e)(1) specifically exempts Section 413(d)(7) from the limitation that only a principal in the first degree to first degree murder is death-eligible and does not state that the term "defendant" as used in Section 413(d)(7) only denotes first or second degree principals. *Id.* at 263, 855 A.2d at 299–300. The aggravating circumstance of employing another person to murder in exchange for remuneration clearly contemplates the inclusion of accessories before the fact because the individual employing the person did so prior to the commission of the murders and generally is not present at the time of the killings. *Id.* Had the General Assembly intended to limit the application of the death penalty to participants in contractual murder who qualify as principals under the law, it could have done so. Because, however, the Legislature made the blanket statement that Section 413(d)(7) is not limited to first degree principals, we determine that it intended to include accessories before the fact involved in contractual murder within the class of death eligible defendants. *Id.*

Grandison, however, relies in large part on *dicta* in this Court's opinion in *Grandison v. State,* 341 Md. 175, 198, 670 A.2d 398, 409 (1995), which states:

> Under our statutory scheme only those convicted as principals in the second degree of first degree murder who "engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration," Art. 27, § 413(d)(7), may be considered for the death penalty. That aggravating circumstance meets the narrowing requirement of the Eighth Amendment.

The above-quoted language, however, is an incomplete statement of the law governing eligibility under Maryland's death penalty statute because accessories before the fact are clearly those who engage or employ another person to commit murder pursuant to a contract. It is entirely consistent with the Eighth Amendment's narrowing requirement to include accessories before the fact who satisfy the terms of Section 413(d)(7) within the class of those eligible for the death penalty and obviously within the plain meaning of the statute.

Grandison also relies on language from *Gary v. State*, 341 Md. 513, 520, 671 A.2d 495, 498 (1996) to support his argument that he is not eligible for the death penalty, where we stated:

[P]ursuant to the Maryland death penalty statute, only principals in the first degree to first degree murder are eligible for the death penalty in Maryland. A principal in the first degree is " 'one who actually commits a crime, either by his own hand, or by inanimate agency, or by an innocent human agent.' " In addition, under the statute, one who *employs* another person to kill is also considered a principal in the first degree for purposes of the death penalty. Since a conviction for conspiracy to murder does not itself establish that the defendant committed the crime by his own hand, by inanimate agency, by an innocent agent, or employed another person to kill, the death penalty is generally unavailable for conspiracy to commit first degree murder.

*Id.* (internal citations omitted and emphasis in original). The above-quoted language in *Gary* is consistent with our conclusion based on the plain meaning of Sections 413(d)(7) and (e)(1). The language in *Gary* merely stands for the proposition that, although the death penalty is generally limited to those who have been determined to be principals in the first degree of first degree murder, those individuals who participate in contractual murder are likewise death-eligible.[7]

---

7. Grandison also argues, as an extension of his principalship argument, that the death sentences were inconsistent with his conviction as a accessory after the fact and constituted a violation of double jeopardy.

## Conclusion

Because we have determined that the evidence at issue in the present case was not material to Grandison's 1983 trial or 1994 re-sentencing under the *Brady* rubric, we find that the State did not violate Grandison's due process rights as set forth under *Brady v. Maryland.* Moreover, we have affirmed the previous conclusion of this Court that Grandison's death sentence under Maryland's death penalty statute does not violate due process of law under *Apprendi v. New Jersey* and *Ring v. Arizona* due to the jury's ability to find that aggravating factors outweighed mitigating factors by a preponderance of the evidence. Furthermore, because Grandison was sentenced to death based on the jury's determination that he employed Evans to commit murder as contemplated by Maryland Code (1957, 1982 Repl.Vol.), Article 27, Section 413(d)(7), we hold that his sentences were proper.

*JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

RAKER, J., dissenting, in which BELL, C.J., and GREENE, J., join.

I respectfully dissent. I adhere to the reasons set out in the dissenting opinions of *Evans v. State,* 389 Md. 456, 886 A.2d 562 (2005), *Miller v. State,* 380 Md. 1, 843 A.2d 803 (2004), *Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003), and *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001).

Chief Judge BELL and Judge GREENE have authorized me to state that they join in this dissenting opinion.

---

Because we have determined that the General Assembly intended to include accessories before the fact who employ another to commit murder within the class of death-eligible defendants, we need not reach this argument.