900 A.2d 227

Michael Jerome BRYANT

v.

STATE of Maryland.

No. 102, Sept. Term, 2005.

Court of Appeals of Maryland.

June 5, 2006.

Stephen B. Mercer (Rene Sandler of Sandler & Mercer, P.C., of Rockville, MD; William G. McLain of the University of the District of Columbia David A. Clarke School of Law of Washington, D.C.), on brief, for Petitioner.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, of Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

CATHELL, J.

Michael Jerome Bryant, petitioner, was convicted by a jury in the Circuit Court for Montgomery County on May 23, 2003, of one count of first degree murder under the theories of premeditated murder and felony murder and one count of first degree burglary, which served as the basis for the felony murder conviction. He was subsequently sentenced to life without the possibility of parole for the first degree murder conviction and a concurrent twenty-year term for the burglary conviction. Petitioner timely filed an appeal with the Court of Special Appeals and that court affirmed the convictions. *Bryant v. State,* 163 Md.App. 451, 881 A.2d 669 (2005).

Petitioner filed a petition for writ of certiorari on November 15, 2005. We granted *certiorari* on December 19, 2005. *Bryant v. State,* 390 Md. 284, 888 A.2d 341 (2005). Petitioner presents two questions for our review:

"1. Whether a criminal defendant's status as an inmate deprives him of the statutory privilege for communications related to his mental or emotional disorder to a nurse conducting a mental health assessment for diagnostic and treatment purposes at a county detention facility?"

"2. Whether a criminal defendant must waive his constitutional right against self-incrimination as a condition prece-

dent to the introduction of expert testimony rebutting or explaining evidence that the state relies upon to establish the *mens rea* element of the offense charged?"

We shall not address the first question as it is written because it makes an assumption not supported by the record. Instead, for the reasons that follow, we hold that petitioner's statements during the intake process are not privileged. We further hold that the trial court did not abuse its discretion in prohibiting petitioner's expert witness from testifying.

## I. Facts

The Court of Special Appeals provided a summary of the facts that led to the present appeal from which we present the following:

"On July 20, 2002, [petitioner]'s ex-wife, Donna Martin, was fatally stabbed at her townhouse located on Merust Lane in Gaithersburg. The victim sustained numerous stab and cutting wounds, and was pronounced dead soon after she was transported to the hospital.

. . .

"The State presented evidence that [petitioner] had threatened Ms. Martin a year before she was killed. Specifically, at a court proceeding held on April 9, 2001, Ms. Martin was speaking to a judge in the presence of [petitioner].[1] A tape of [petitioner]'s comments was admitted in evidence, and showed that he made threatening comments to Ms. Martin at that time.[2] In addition, Cynthia Sargeant, a registered nurse, came into contact with [petitioner] on April 9, 2001, during an intake medical screening at the Montgomery County Detention Center. Sargeant testified: '[petitioner] indicated that he had a definite plan to kill her. He indicated that he enjoyed seeing her blood. He

---

1. The prior proceeding was a bond review hearing stemming from the alleged prior stabbing of Ms. Martin by petitioner.

2. "The tape was not transcribed in the record." *Bryant,* 163 Md.App. at 456 n. 1, 881 A.2d at 672 n. 1.

indicated that he was obsessed with killing her and that she messed with him.' Sargeant added that [petitioner] also stated that the '[t]hought of killing her won't go away.' "

. . .

"Several witnesses from the victim's neighborhood testified that they saw a man, not specifically identified as [petitioner], near the victim's home on July 20, 2002. For example, Mary Freckleton testified that on July 20, 2002, between 9:00 a.m. and 10:00 a.m., she was visiting her sister, who lived in an apartment on Merust Lane in Gaithersburg, when she looked out the window and noticed a man 'walking back and forth.' Freckleton, who visited her sister nearly every day, did not recognize the individual as someone who lived in the neighborhood. Later, between 12:00 p.m. and 1:00 p.m., Freckleton again saw the man. Thereafter, between 3:30 p.m. and 4:00 p.m., Freckleton saw the man 'sitting on the side of the embankment looking down at the apartments[.]' "

"When asked to describe the man, Freckleton responded:
'He was brown skin, short hair. I remember his lips was full. I say he was maybe six, five feet, something and he weighed about 200 and some pounds. He had real short close—short close hair. His hair was cut real close. He was brown skin. . . .

\* \* \*

"When I seen him the first time, he had a tee-shirt on. It wasn't—it was not white. If it was white, it was dirty. It was dirty, dirty. It wasn't white. He had . . . I don't if it was jeans. I can't recall if it was blue jeans or black jeans."

. . .

"Stanley Bradley testified that, at 5:00 p.m. on the date in question, he was working with Joseph Hammond, a friend, on Hammond's car, which was parked on Merust Lane. At

that time, he noticed a woman with a baby in her arms and a little boy walking toward the door to a townhouse. When the woman was at the door, Bradley heard a bang followed by the woman 'hollering.' Upon looking toward the house, Bradley saw the arm of an African–American male grab the woman by the hair and he also 'vaguely' saw a knife. The woman yelled: 'Somebody help me. He is going to kill me.' He saw a man drag the woman, who was still holding the baby, into the house, leaving the boy outside. Bradley also heard yelling coming from inside the house. A woman went to the door and took the child, who had been left outside. The police were called and, when they arrived approximately five minutes later, Bradley related what had occurred."

. . .

"Ms. Martin sustained multiple stab and cutting wounds. She was flown to Suburban Hospital, where she was pronounced dead. An autopsy performed by Dr. Zabiullah Ali revealed that Ms. Martin received eight stab wounds and nine cutting wounds. Two of the stab wounds injured Ms. Martin's left lung and one of them injured her heart."

. . .

"On the morning of July 24, 2002, [petitioner] was arrested in an apartment on North Summit Drive in Gaithersburg. The police found him sitting in a bedroom closet behind a closed door. A wristwatch that appeared to have dried blood on it was recovered from [petitioner]'s wrist."

. . .

"In the defense case, counsel read the following statement to the jury: On February 14th of 2002, the defendant made the following statement to a physician, quote: 'I don't have the urge to kill any more like before.' [Petitioner] did not testify."

*Bryant,* 163 Md.App. at 455–62, 881 A.2d at 672–76 (some footnotes omitted).

## II. Standard of Review

 The first question presented for our review requires our interpretation of Maryland Code (1973, 2002 Repl.Vol.), § 9–109(a)(3) of the Courts & Judicial Proceedings Article ("C.J."), which states:

> " 'Patient' means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist." [3]

We have often stated that "the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Melton v. State,* 379 Md. 471, 476, 842 A.2d 743, 746 (2004) (quoting *Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240, 1245–46 (2001)). The first step in our analysis is to examine the plain language of the statute. *Grandison v. State,* 390 Md. 412, 445, 889 A.2d 366, 385 (2005). We will not look beyond the plain meaning of the statute when the words used are unambiguous. *Grandison,* 390 Md. at 445, 889 A.2d at 385; *Deville v. State,* 383 Md. 217, 858 A.2d 484 (2004); *Melton,* 379 Md. at 477, 842 A.2d at 746.

 When the statute provides definitions of a particular term, we use the statutory definition in determining the scope of the specific words used. *Gilmer v. State,* 389 Md. 656, 667, 887 A.2d 549, 556 (2005). Furthermore, each word of the statute must be read so as to not render it "surplusage, superfluous, meaningless, or nugatory." *Gilmer,* 389 Md. at 663, 887 A.2d at 553; *Lawson v. State,* 389 Md. 570, 583, 886 A.2d 876, 883 (2005); *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005). The Court has also stated that privilege statutes are interpreted narrowly. *E.I. du Pont de*

---

**3.** It is unclear whether the word "either" in the statute refers to "diagnosis or treatment" or whether it refers to "a psychiatrist [or] licensed psychologist." Our analysis and holding are the same under both interpretations.

*Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 406, 718 A.2d 1129, 1134 (1998) ("The attorney-client privilege as applied in judicial proceedings is narrowly construed...."); *Sears, Roebuck & Co. v. Gussin,* 350 Md. 552, 562, 714 A.2d 188, 192 (1998) (stating that the statutorily created accountant-client privilege is narrowly construed because it is in derogation of the common law).[4]

The second question presented for our review requires the Court to determine whether the trial court abused its discretion in excluding petitioner's expert witness testimony. We have often stated that " 'the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Clemons v. State,* 392 Md. 339, 359, 896 A.2d 1059, 1071 (2006); *Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034, 1039 (2002) (quoting *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258, 273 (1992)); *Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581, 590 (1992); *Johnson v. State,* 303 Md. 487, 515, 495 A.2d 1, 15 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); *but see Kelly v. State,* 392 Md. 511, 898 A.2d 419 (2006) (stating that the trial court has limited discretion in excluding all testimony from all factual witnesses of a particular party); *Redditt v. State,* 337 Md. 621, 655 A.2d 390 (1995) (same); *Void v. State,* 325 Md. 386, 601 A.2d 124 (1992) (same); *McCray v. State,* 305 Md. 126, 501 A.2d 856 (1985) (same). We have further held that "[i]n exercising the wide discretion vested in the trial courts

---

4. Petitioner argues that the psychiatrist/psychologist-patient privilege is analogous to the attorney-client privilege and that the statements made to the nurse should be equated to those made to a paralegal during an intake interview of a potential client for a lawyer. The statutory language governing attorney-client privilege, codified under C.J. § 9–108, however, is completely different than that of C.J. § 9–109. While C.J. § 9–108 codifies the common law attorney-client privilege, C.J. § 9–109 is an entirely statutory construct. As a result, C.J. § 9–109's interpretation must be restricted to the statutory language used in that section.

concerning the admissibility of expert testimony, a critical test is 'whether the expert's opinion will aid the trier of fact.' " *Rollins v. State*, 392 Md. 455, 897 A.2d 821 (2006) (quoting *I.W. Berman Properties v. Porter Bros. Inc.*, 276 Md. 1, 12–14, 344 A.2d 65, 73–74 (1975)). We must, therefore, also determine whether the trial court abused its discretion in excluding the petitioner's expert witness testimony.

## III. Discussion

### A. The Psychotherapist/Psychologist–Patient Privilege

■ While not specifically privileged under the common law, communications between a patient and his or her psychotherapist or psychologist are now statutorily privileged. The privilege was created by the legislature and is codified in C.J. § 9–109, which states:

> "Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a *patient* or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:
>
> (1) Communications relating to diagnosis or treatment of the patient; or
>
> (2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment."

C.J. § 9–109(b) (emphasis added).

Petitioner contends that he is a "patient" as contemplated under the aforesaid subsection (a)(3), which states:

> " 'Patient' means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist."

C.J. § 9–109(a)(3). In petitioner's view, the communications made to Ms. Sargeant as a part of the intake medical screening at the time of the prior proceeding on April 9, 2001, were

made for diagnosis or treatment and nurse Sargeant qualified as "any other person participating directly or vitally" in petitioner's diagnosis or treatment. As a consequence of what he deems his status as a "patient" at the prior intake screening, petitioner argues that his comments to the nurse at that time were privileged and that the court erred in allowing the State to elicit those statements during the subsequent trial for the present offenses for which he was convicted.

Petitioner's initial argument is not based upon a reading of C.J. § 9–109, but upon a general overview of Maryland's public policy of providing mental healthcare services to inmates. Petitioner points to the thousands of inmates and parolees who are in need of mental healthcare. He contends that as a result of such a great number of people in need of attention, the State has adopted a policy of providing mental healthcare services for all inmates who need it. This policy, petitioner posits, had its origin in the case of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); where the Supreme Court of the United States held that the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103, 97 S.Ct. at 290, 50 L.Ed.2d 251. Furthermore, the United States Court of Appeals for the Fourth Circuit has held that the medical treatment to which inmates are entitled includes mental healthcare services. *Bowring v. Godwin*, 551 F.2d 44, 47 (1977).

Based upon the public policy he proffers exists, petitioner reasons that the communications between an inmate and any nurse or other person interviewing a potential inmate as to health conditions, during all intake screenings must be privileged. He alleges support exists in Maryland Code (1999), § 11–203 of the Correctional Services Article ("C.S."), which requires local correctional facilities to provide for the safety, health, and welfare of inmates. The statute requires the local facility to provide (i) food and board, and (ii) "any article of comfort that is considered necessary for a sick inmate by the physician attending the inmate." C.S. § 11–203(a). Petitioner also points to COMAR 12.14.04.02(15), which requires local

facility managers to "have a written policy" that includes, *inter alia,* the "identification, housing, treatment, supervision, and referral of a mentally ill inmate." Finally, petitioner states that Montgomery County Code Part 2 § 13–9, which requires the correctional facility to provide a medical examination and access to daily medical or sick call facilities, brings the intake screening within the scope of C.J. § 9–109. The State does not dispute that public policy requires correctional facilities to provide mental healthcare services to inmates. It argues, however, that the intake screening process is not part of the mental health *treatment* provided by these institutions.

We first turn to the meaning of the word "patient" in C.J. § 9–109. The statute itself provides the definition of "patient" and, therefore, as we stated earlier, we need not go beyond that language in order to determine petitioner's status. *Gilmer,* 389 Md. at 667, 887 A.2d at 556. Section 9–109(a)(3), provides the definition of "patient" as stated *supra,* and for the purpose of this case, it can be reduced to two specific requirements: First, there must be a communication regarding the *diagnosis* or *treatment* of the person's mental or emotional disorder; second, the communication must be with a psychiatrist, licensed psychologist or "any other person participating *directly* or *vitally* with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist." (Emphasis added.)

Our inquiry focuses on the purpose of the communication: Is the exchange between the inmate and the screener "regarding diagnosis or treatment?" In order to answer this question we look to the purpose of the intake screening. Petitioner argues that the intake screening is an integral part of the inmate's treatment. He relies on the National Commission on Correctional Health Care ("NCCHC") *Standards for Health in Jails* (2003).[5]

---

5. NCCHC is a non-profit organization created as a result of an American Medical Association's study of jails. http://www.ncchc.org/about/index.html (last visited May 15, 2006). The organization develops

Montgomery County follows the NCCHC standards. Both petitioner and the State rely on these standards in support of their respective positions. One of the requirements for NCCHC accreditation, which Montgomery County Correctional Facilities has achieved, is that the institution must provide mental healthcare services for all inmates who require them. NCCHC standard J–G–04. NCCHC has also provided guidance on what is required for providing mental healthcare services to inmates. In 1992, it issued a *Position Statement, Mental Health Services in Correctional Settings.* The statement provided that based upon the decision in *Ruiz v. Estelle,* 503 F.Supp. 1265, 1339 (S.D.Tex.1980), *rev'd in part,* 679 F.2d 1115 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), the

> "minimum requirements for mental health services in correctional settings must include:
> - screening and evaluation to identify those needing mental health care;
> - a treatment plan for identified problems;
> - qualified mental health staff sufficient to treat the population;
> - a health records system;
> - a suicide prevention and treatment program; and,
> - the appropriate use of behavior-altering medications."

The position letter further provided a standard for mental health evaluations that is very similar to Montgomery County Code Part 2 § 13–9. It requires an inmate examination *within fourteen days of admission* for evaluation of that inmate's mental healthcare needs. Petitioner asserts that NCCHC standard J–H–02 requires that health records and information must be kept in confidence and that staff must be trained to maintain the confidentiality of inmates' records and information. Furthermore, petitioner contends, NCCHC standard J–A–09 requires that all *"clinical encounters"* be

standards for healthcare in correctional facilities. It also provides accreditation for the institutions that meet its requirements.

conducted in private and must encourage the inmate to partic-
ipate in subsequent healthcare services. In petitioner's view,
the entire process, including the intake screening, is for the
purpose of providing mental healthcare services to the inmate
and that any communication relating to that process is for the
diagnosis or treatment of the inmate. Hence, he asserts, it
must be privileged.

The State also relies on the NCCHC standards, but it gives
them a narrower reading. It points to NCCHC J–E–02
entitled "RECEIVING SCREENING," which provides:

**"Standard**

Receiving screening is performed on all inmates *immediate-
ly upon arrival* at the intake facility.

**Compliance Indicators**

. . .

2. Qualified health care professionals or health-trained
personnel perform the receiving screening.
3. The receiving screening takes place *immediately* for all
inmates.

. . .

5. Reception personnel, using a health-authority-approved
form, inquire about [the inmate's medical and mental histo-
ry] . . .

. . .

**Discussion**

. . .

Receiving screening is a process of structured inquiry and
observation *designed to prevent newly arrived inmates who
pose a threat to their own or others' health or safety from
being admitted to the facility's general population,* and to
get them rapid medical care. It is intended to identify
potential emergency situations among new arrivals to the
facility, and also to ensure that those patients with known

illnesses and currently in medication are identified for *further* assessment and continued treatment.

. . .

... [T]his standard allows receiving screening to be conducted by *health-trained correctional staff members*. The training correctional officers are given depends upon the role they are expected to play in the receiving screening process. At a minimum, they receive instruction on how to take a medical history; how to make the required observations; how to determine the appropriate disposition of an inmate based on responses to questions and observations; and how to document their findings on the receiving screening form. (Emphasis added.)

We can gather a number of insightful points from the NCCHC's description of the intake screening process. First, it is immediately given to every inmate without regard to their actual medical or mental needs. Second, it can be conducted by a healthcare professional or "health-trained" personnel, it does not require that the person doing the intake screening be a mental healthcare provider or be associated with any psychiatrist or psychologist. Third, the intake follows a specific form designed to determine any possible concerns about the inmate. Finally, the screening is *"designed to prevent newly arrived inmates who pose a threat to their own or others' health or safety from being admitted to the facility's general population ...."* (Emphasis added.) The NCCHC's own standards, which are utilized in Montgomery County, provide that the primary purpose of the screening is to protect not only the individual inmate but the general population from the inmates' possible physical and mental issues and not for diagnosis or treatment of the inmates. Although the screening may ultimately lead to diagnosis or treatment, such a result is only incidental at the time the immediate intake screening is conducted.

Assuming, *arguendo*, that the communication was for the purpose of diagnosis or treatment of the inmate, the person with whom the inmate communicates, at the time of intake

screening, must be "participating *directly* or *vitally* ... in consultation with or under direct supervision of a psychiatrist or psychologist," in order for the inmate to be a "patient." C.J. § 9–109(a)(3) (emphasis added). In construing the statute we must give force to each word and not make any word superfluous or nugatory. *Gilmer,* 389 Md. at 663, 887 A.2d at 553; *Lawson,* 389 Md. at 583, 886 A.2d at 883; *Moore,* 388 Md. at 453, 879 A.2d at 1115. The words "directly" and "vitally" modify the statement "with either in rendering those services," i.e., diagnosis or treatment. They play a significant role in our interpretation because under the plain understanding and use of the English language they serve to narrow the scope of the statute.

We will briefly discuss the statute's legislative history. The psychiatrist/psychologist-patient statutory privilege was first enacted as Chapter 503 of the Acts of 1966. The stated purpose of the statute was:

"AN ACT ... providing that certain disclosures and communications between a patient and a certified psychologist or a person licensed to practice medicine while acting in the capacity of a psychiatrist shall be privileged communications under certain circumstances and relating generally to the terms and conditions for this privilege."

The act went on to define the word "patient," stating:

*"As used in this section 'patient' means a person who communicates regarding or receives services for the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, certified psychologist, or other persons participating* DIRECTLY AND VITALLY *with either in rendering such services in consultation with, or under the direct supervision and direction of a psychiatrist or psychologist* ...."

*Italicized* text in the statute indicated new matter added to existing law. Thus, Chapter 503, an addition to Article 35 of the 1957 Code, was new law. Moreover, text set in ALL CAPITALS indicated amendments to the bill. It is clear, then, that the words "directly and vitally" were specifically

added to the proposed bill during the Legislative process. As a result, it is reasonable to infer that the General Assembly intended those words to play a specific role in the effect of the law, i.e., limiting the scope of the privilege and who qualifies as a recipient of privileged information.

The words "directly" and "vitally," are not defined in the statute. We can ascertain their common every day meaning through the use of a dictionary. *State Dep't of Assessments and Taxation v. Maryland–National Capital Park and Planning Comm'n*, 348 Md. 2, 14, 702 A.2d 690, 696 (1997) ("[I]n deciding what a term's ordinary and natural meaning is, we may, and often do, consult the dictionary."). In using dictionaries to interpret the intent of the legislature we have further stated: "Because we are attempting to ascertain the intent of the Legislature in choosing certain language at a point in time, resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments." *Harvey v. Marshall*, 389 Md. 243, 260–61 n. 11, 884 A.2d 1171, 1181 n. 11 (2005).

"Directly" means: "without any intervening space or time: next in order[,] . . . without divergence from the source or the original[,] . . . in close relational proximity[,] . . . without any intervening agency or instrumentality or determining influence: without any intermediate step. . . ." *Webster's Third New International Dictionary* 641 (Unabridged ed. 1961)("Webster's"); *The Random House Dictionary of the English Language* 407 (Unabridged ed. 1983)("Random House") ("in a direct line, way, or manner; straight. . . ."); *Black's Law Dictionary* 492 (8th ed.2004) ("**1.** In a straightforward manner. **2.** In a straight line or course. **3.** Immediately."). In the context of C.J. § 9–109, "directly" means that there cannot be an intermediate or intervening step between the person receiving the information and the diagnosis or treatment. In the present case, as explained *supra*, the communication is not "directly" related to the diagnosis or treatment of the inmate. Furthermore, the nurse—at the time of the

intake screening—does not work "directly" with a psychiatrist or psychologist.[6]

"Vitally" is the adverb of the word "vital," which means: "[O]f the utmost importance: essential to the continued existence, vigor, efficiency, independence, or value of something expressed or implied . . .; *often:* taking priority in consider-

---

**6.** Nurse Sargeant, during a hearing on a defense's motion *in limine* to suppress her testimony at the murder trial (as to what had been said at the intake screening relating to the prior stabbing incident), stated that she was an employee of the Montgomery County Department of Corrections and provided the following explanation of the intake process:

"I think I was working in the medical [department] that afternoon, and people come to the medical service after they're processed through the other services in the jail.

"It's on a first come first serve in terms of new lockups. They are brought up and put into, we sort of call it the bull pen, waiting to be meeting with a nurse.

"And then one of us nurses just grabs the new lockup, screen, introduces himself and asks the person to come into the exam room."

In addition, Arthur M. Wallenstein, the director of the Montgomery County Department of Corrections and Rehabilitation, at the same hearing testified that the intake screening is conducted by community health registered nurses, not mental health specialists. He pointed out that referrals from the intake screening are not to the jail psychiatrist, but to the Crisis Intervention Unit ("CIU"), which then refers the inmate to the appropriate specialist.

Ms. Sargeant also explained that in addition to conducting intake screenings she also subsequently worked with the jail psychiatrist and transcribed orders for medications. She further testified that after petitioner was referred to the CIU, as a result of the intake screening at issue here, she eventually participated in the petitioner's psychiatric treatment. She stated, however, that *at the time of the intake screening* she was not providing medical care or treatment to the petitioner. Neither at the hearing, nor at the subsequent trial for the murder of Ms. Martin, was the nurse asked to reveal any communications that may have taken place during petitioner's treatment after the intake screening. The nurse's subsequent role in the diagnosis or treatment of an inmate does not change the purpose of the intake screening, which, as already stated, is to protect the inmate and the general population of the jail from the inmate's possible physical and mental issues.

When Ms. Sargeant testified at trial, the defense attempted to elicit information regarding her subsequent treatment of the petitioner. The trial court, upon the State's objections, did not allow Ms. Sargeant to mention her participation in petitioner's treatment after the intake screening was conducted and petitioner was referred to the jail psychiatrist. Petitioner has not appealed the trial court's ruling on the exclusion of that testimony and, therefore, the propriety of that ruling is not before the Court.

ation over other factors or elements. . . ." *Webster's* at 2558; *Random House* at 1597 ("necessary to the existence, continuance, or well-being of something; indispensable; essential. . . ."). The use of the word "vitally" in C.J. § 9–109 means that the person receiving the information must be essential or indispensable for the diagnosis or treatment of the individual. The intake nurse, (or other intake screener), does not meet either of these requirements. Her role in the diagnosis or treatment of the inmate, at that time, ends with a referral for further evaluation prior to actual treatment being rendered. Her function, at that point, does not include treatment.

In light of the clear meaning of the statute, the terms "directly or vitally" must be read as narrowing the scope of the privilege (even if it were to apply generally to all intake proceedings). The statute restricts the privilege to those communications taking place between an individual and someone who is intimately related to that individual's psychological or psychiatric treatment and additionally is directly associated with a psychiatrist or psychologist. Were we to interpret this section as allowing the privilege to cover *any* communication that might ultimately lead to treatment as privileged, the words "directly" and "vitally" would be rendered superfluous. Had that been the intent of the Legislature, it could have enacted the statute as it was originally presented in the bill. The General Assembly, however, expressly added these two qualifiers and they must be given the effect intended.

The trial court, in accordance with this interpretation, properly stated: "The intake screener's duties are to take information from recent inmates concerning their *whole medical condition.* Information concerning their mental health status is just one of [many] topics about which the inmate is queried. . . ." [Emphasis added.] As a result, "The intake screener at MCDC cannot be construed as '*a person participating directly or vitally with [a psychiatrist or psychologist] . . . .*' "

Petitioner claims that the Court of Special Appeals' and the trial court's decisions, in effect, make an inmate's mere status

as a detainee determinative of his right to claim the privilege afforded by the statute. It is not the status of the inmate as a detainee, however, that is determinative. It is the status of the person to whom he communicated his remarks that normally will determine whether the privilege applies. Whether the individual is an inmate or not, he or she must be able to show that the person to whom the communication is directed belongs to one of the statutory classifications in order to claim the privilege.

Lastly, petitioner argues that such narrow interpretation of the statute is contrary to holdings from other courts. We disagree. Petitioner offers the following examples: *United States v. Lincoln,* 403 F.3d 703, 705 (9th Cir.2005) (the federal patient-psychotherapist privilege protected contents of a workbook written by an inmate as part of anger management classes, thus it was related to treatment); *State v. Jenkins,* 271 Conn. 165, 180, 856 A.2d 383, 392 (2004) (statutory privilege protects "In–Patient Mental Health Nursing Assessment" of inmate); *In re Joy P.,* 200 Wis.2d 227, 234, 546 N.W.2d 494, 498 (Ct.App.1996) (communications with jail psychologist are privileged); *State v. Langley,* 314 Or. 247, 264, 839 P.2d 692, 703 (1992) (written assignments, i.e., treatment, in a program for mentally and emotionally disturbed inmates are privileged). The fatal flaw in petitioner's argument is that all these cases refer to activities involving individuals who would likely qualify under C.J. § 9–109 in light of our interpretation of the statute.

Our analysis of C.J. § 9–109 leads to the conclusion that the trial court in the present case properly admitted nurse Sargeant's testimony, as to the petitioner's statements at an intake screening in relation to a prior incident. That intake screening was not conducted for the purpose of communicating information relating to the diagnosis or treatment of the inmate, but to protect the inmate and the general population of the facility. Furthermore, the evidence in the record does not reflect that nurse Sargeant was "directly or vitally" related to diagnosis or treatment generally, or of the petitioner specifically; nor does the evidence indicate that at the time

she conducted petitioner's intake screening, she was then acting in concert with a psychiatrist or psychologist.

## B. Expert Testimony

██ Petitioner was convicted of premeditated first degree murder under Maryland Code (1957, 1987 Repl.Vol.), Article 27 § 407, which states: "All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of willful, deliberate and premeditated killing shall be murder in the first degree." [7] The jury found that petitioner's actions were premeditated. In *Mitchell v. State*, 363 Md. 130, 767 A.2d 844 (2001), we stated:

"The element that distinguishes this form of second degree murder from first degree murder is that of deliberation and premeditation. For murder "to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate.' *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980). We added in *Tichnell*, however, that '[i]t is unnecessary that the deliberation or premeditation shall have existed for any particular length of time.' *Id.* at 717–18, 415 A.2d at 842. 'Appreciable length of time' simply means 'any amount of time sufficient to convince the trier of fact that the purpose to kill was not the immediate offspring of rashness and impetuous temper,' but was the product of a mind 'fully conscious of its own design.'" *Willey v. State*, 328 Md. 126, 133, 613 A.2d 956, 959 (1992). Quoting from *Colvin v. State*, 299 Md. 88, 108, 472 A.2d 953, 963, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), we confirmed in *Willey* that '[i]f the killing results from a *choice made as the result of thought, however short the struggle between the intention and the act*, it is sufficient to characterize the crime as deliberate and premeditated murder.' *Willey, supra*, 328 Md. at 133,

---

**7.** Effective October 1, 2002, first degree murder is now codified as Maryland Code (2002), § 2–201 of the Criminal Law Article.

613 A.2d at 959. Indeed, a delay between firing a first and second shot 'is enough time for reflection and decision to justify a finding of premeditation.' *Hunt v. State,* 345 Md. 122, 161, 691 A.2d 1255, 1274, *cert. denied,* 521 U.S. 1131, 117 S.Ct. 2536, 138 L.Ed.2d 1036 (1997) and cases cited therein."

*Id.* at 148–49, 767 A.2d at 854. Petitioner claims that he should have been allowed to present testimony from an expert witness to the effect that he suffered from an impulse control disorder, which resulted in his inability to form the required *mens rea* of premeditation.

Before trial, petitioner informed the State that he would seek to introduce the testimony of two experts, Susan Fiester, M.D., and Michael O'Connell, Ph.D. The experts were to testify that petitioner suffered from an impulse control disorder and that, due to this ailment, petitioner was unable to form the required *mens rea* for premeditated murder. The State moved to exclude the testimony, arguing that a condition such as impulse control disorder was not relevant unless the defendant admitted that he had committed the crime. The trial court denied the motion, stating that it would revisit the issue during trial and evaluate whether the defense had provided a sufficient factual basis for admitting the testimony.

When the State closed its case, petitioner's counsel attempted to have one of the expert witnesses, Dr. Fiester, testify. The expert witness offered her testimony outside of the presence of the jury. During that direct examination, the expert testified that petitioner had impulse control disorder. She explained that this condition consisted of "the occurrence of discrete episodes of a failure to control or resist aggressive impulses." *Bryant,* 163 Md.App. at 466, 881 A.2d at 678. She also testified that "the ability to have that intent and the ability to control one's behavior can vary from moment-to-moment, day-to-day, month-to-month, or year-to-year in any given individual, even with a baseline set of personality or psychiatric symptoms." *Id.* at 467, 881 A.2d at 678–79. During cross-examination, Dr. Fiester further testified that "[t]he disorder is present all the time, but the ability of the individu-

al to resist those impulses can vary." *Id.* at 470, 881 A.2d at 680.

The trial court questioned the expert witness when the State completed its cross-examination:

"THE COURT: You are not saying, are you, that every person or even this person who has impulse control disorder isn't capable of controlling his actions, are you?

THE WITNESS: At all points in time, no. That's correct.

THE COURT: So, anyone with this disorder is capable of planning a future action. Is that correct?

THE WITNESS: Yes. Just the presence of the disorder itself, without further information, would [lead] me to say that it's possible an individual that carries this diagnosis could plan a crime."

*Id.* at 470, 881 A.2d at 680. After petitioner's counsel and the State completed their examination of the witness, the court stated:

"I am holding that [Dr. Fiester's] testimony is not competent and is not relevant to this case. There is no evidence that there was an absence of a particular mental element of the crimes charged in this case. At the most, we have testimony from Dr. Fiester that the defendant suffers from impulse control disorder, which affects him from time-to-time.

"Whether that disorder affected him at the time of the crimes committed here would be completely speculative. This testimony would not assist the jury, but would rather confuse them."

*Id.* at 470–71, 881 A.2d at 680. In reviewing the trial court's decision, the Court of Special Appeals found that

"Dr. Fiester's testimony was not relevant to the issues in the case. The doctor's testimony would merely have presented evidence that [petitioner] suffered from an impulse control disorder, which sometimes prevented him from controlling his aggressive impulses. There was simply no

evidence that Ms. Martin's murder was the result of an impulsive act."

*Id.* at 482, 881 A.2d at 687. We agree.

Petitioner argues that the Court of Special Appeals' decision required the petitioner to testify in order to present evidence refuting the *mens rea* of premeditated murder. In support of this contention, petitioner points to the intermediate appellate court's statement that: "*Among other things,* [petitioner] never acknowledged that he murdered Ms. Martin." *Id.* at 481, 881 A.2d at 686 (emphasis added). It is clear, however, that petitioner's failure to testify was but one of a number of reasons for which the Court of Special Appeals found that the trial court properly excluded the expert witness testimony.

The admissibility of expert testimony is governed by Maryland Rule 5–702, which provides:

"Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

We have previously described the basic standard for the initial inquiry into the admissibility of expert testimony in *State v. Smullen,* 380 Md. 233, 844 A.2d 429 (2004), where Judge Wilner, writing for the Court, stated:

"Even reliable evidence is admissible only if it is relevant in the particular case, *i.e.,* if it has a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Maryland Rules 5–401 and 5–402. The requirement of relevance applies not just to factual evidence but to expert testimony as well. Testimony

by experts is admissible only if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, and, in making that determination, the court must decide, among other things, 'whether a sufficient factual basis exists to support the expert testimony.' Maryland Rule 5–702. The question, in this regard, is whether an issue of consequence in this case was sufficiently generated to which the proposed evidence would be relevant."

*Id.* at 268–69, 844 A.2d at 450.

The Court of Special Appeals appropriately relied on *Hoey v. State*, 311 Md. 473, 536 A.2d 622 (1988), for the proposition that evidence negating the *mens rea* of an alleged offense is relevant and admissible for that purpose. *Bryant*, 163 Md. App. at 474, 881 A.2d at 682. As the intermediate appellate court pointed out, *Hoey* was followed by *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), where this Court determined that expert testimony is admissible for showing that a defendant had a subjective belief that the use of force was necessary to prevent imminent death or serious bodily injury in support of the defendant's imperfect self-defense claim. *Id.* at 48, 542 A.2d at 1258. These opinions did not, however, hold that expert testimony offered to negate the *mens rea* of an alleged offense was admissible without a proper foundation.

We find *Hartless v. State*, 327 Md. 558, 611 A.2d 581 (1992), to be on point. David Andrew Hartless was convicted of the premeditated first degree murder of a 20–year–old clerk at a High's Dairy store. Before trial, the defense informed the State that it intended to provide expert psychiatric testimony negating the *mens rea* of premeditated murder. At trial, the defense attempted to introduce the psychological profile of Hartless through the testimony of his psychiatrist, Dr. McDaniel. The testimony was to point out that Hartless was subject to a high level of stress from his father. The trial court then stated that such testimony alone would not be sufficiently relevant to be admissible. The following colloquy, relevant to the case at bar, ensued:

"DEFENSE COUNSEL: ... What we're saying is here we have the right to show that a particular mental element of a crime did not exist. If we put on Dr. McDaniel to testify as to what a psychological profile was, what his state of mind was, what stress was there, what other matters were brought to bear on him, they're subject not only to my direct examination but to the State's cross-examination.... She's also subject to the State's rebuttal witnesses.

THE COURT: What would be the conclusion of the doctor?

DEFENSE COUNSEL: Your Honor, the conclusion is the psychological profile.

THE COURT: What would be the conclusion? The conclusion is that he has a psychological profile—so does everyone.

DEFENSE COUNSEL: And that's a factor to be taken into determination by the ...

THE COURT: For what purpose, Mr. Kraft?

DEFENSE COUNSEL: To determine whether he had the sufficient *mens rea* to create the intent. It's all done by inference, Your Honor."

*Id.* at 575–76, 611 A.2d at 589–90. The trial court then found that the defense had failed to provide an appropriate factual foundation for the testimony.

We affirmed the trial court decision in *Hartless;* Judge McAuliffe, writing for the Court explained:

"In Hartless' case, the psychological testimony, standing alone, had little or no rational nexus to the issues of premeditation and intent. It is thus unclear how a jury could have found the profile helpful in determining those issues."

"The absence of a nexus between a psychological profile of the defendant that Dr. McDaniel might have been able to relate and the issues before the jury resulted, at least in part, from the absence of an adequate evidentiary foundation. As the trial judge noted, the defendant failed to produce admissible evidence of some facts that Dr. McDaniel wished to rely on in determining the defendant's psycho-

logical background, and failed to produce evidence of particular facts relating to the occurrence of the criminal event, *i.e.*, the defendant's version of what happened, that were essential, not only to the formation of the expert's opinion but to the relevance of that opinion to the issues in the case."

*Id.* at 577, 611 A.2d at 590. As *Hartless* demonstrates, although expert testimony can be admitted to negate the *mens rea* element of a specific intent crime, a proper evidentiary foundation normally must be laid.

Petitioner contends that such a foundation was properly established in the case *sub judice*. In his view a proper inference can be drawn that the killing was impulsive. First, he contends, that "the manner of Ms. Martin's death is entirely consistent with an explosive act of rage; she was stabbed multiple times in an apparently impulsive manner...." According to petitioner because there was "no clear 'execution style' stab or cut" the killing must have been impulsive. Second, he states that the killer's apparent exit through a window, broken in the process, was indicative of a state of panic after the stabbing. Finally, petitioner contends, that the presence of male clothing and a picture of petitioner with Ms. Martin and their children found in the apartment suggested that the couple had reconciled. These inferences, which arguably may be proper, do not adequately support petitioner's contention that a proper foundation had been laid to admit the expert testimony. We agree with the Court of Special Appeals' conclusion that

"the objective evidence clearly showed that the murderer acted with premeditation. We note, for example, that an individual was seen pacing near Ms. Martin's residence for hours before the murder, and the same person questioned a boy to learn where Ms. Martin lived. Inside Ms. Martin's residence, the cord to one telephone was cut and the other was missing. Two knives were found, as was a stick used to sharpen knives. *This conduct is the antithesis of an impulsive act. Therefore, Dr. Fiester's testimony would not have*

*made it more likely that the murderer acted without premeditation."*

*"In addition,* although [petitioner] sought to admit expert testimony that he suffered from an impulse disorder, *Dr. Fiester indicated that, even with the disorder, [petitioner] was still sometimes able to control his impulses and he would be capable of planning a crime. Accordingly, the effect of the disorder on [petitioner]'s ability to form the requisite mens rea, and in explaining his earlier threats against Ms. Martin, was speculative."*

*Bryant,* 163 Md.App. at 481, 881 A.2d at 686–87 (emphasis added).

We are not holding, and neither did the Court of Special Appeals, that a defendant must testify in order to introduce expert testimony in respect to the *mens rea* for premeditated first degree murder. There must be sufficient evidence on the record, however, of whatever nature, supporting the expert witness's testimony. In the case *sub judice,* as the trial court pointed out, there is insufficient foundational evidence to support petitioner's argument that he suffers from impulse control disorder and that the death of the Ms. Martin was the result of that affliction. In fact, as the Court of Special Appeals recognized, the totality of the evidence points towards premeditation. We find that the trial court did not abuse its discretion when it denied petitioner's request to allow his expert to testify.

## IV. Conclusion

We hold that a criminal defendant's status as an inmate does not deprive him or her of the statutory privilege for communications related to his mental or emotional disorder. The privilege, however, does not extend to communications to a person, nurse or otherwise, conducting an intake screening at a county detention facility for the purpose of "prevent[ing] newly arrived inmates who pose a threat to their own or others' health or safety to be admitted to the facility's general population." As a result, the trial court properly admitted the nurse's testimony.

We also hold that, although a defendant does not have to waive his right of self-incrimination as a condition precedent to the introduction of expert testimony rebutting or explaining evidence that the State relies upon to establish the *mens rea* element of the offense charged, there must be a proper factual foundation supporting the expert testimony proffered. Consequently, the trial court did not abuse its discretion in excluding petitioner's testimony.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.**